**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK SAMSUNG GALAXY, CURRENTLY IN DEA CUSTODY IN PORTLAND, MAINE | No. 2:24-mj-374-KFW<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Nicholas Gowen, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one electronic device—which is described in Attachment A and currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the United States Drug Enforcement Administration and have been so employed since January of 2024. I graduated from the Drug Enforcement Administration's Basic Agent Training Academy in June of 2024, and was assigned to the Portland, Maine office. Previous to my assignment with the DEA, I was employed by the Portland, Maine Police Department for eleven years. I graduated from the Maine Criminal Justice Academy in June of 2013 and was assigned to uniformed patrol until 2016. In 2016 I became a member of the Portland Police Crime Reduction Unit. In this capacity I was assigned to proactive investigations involving drug, violent crime, and firearm violations within the city of Portland. In 2019 I became a Task Force Officer with the Federal Bureau of Investigation (FBI) Southern Maine Gang Task Force. From 2019 through January 2024, I worked as both

a detective with the Portland Police Department, as well as a Task Force Officer with the FBI. In these roles I worked numerous violations of both state and federal laws, with a focus on criminal enterprise and violent crime investigations. In the course of my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by analysis to be scheduled drugs, including but not limited to heroin, fentanyl, cocaine, crack cocaine, methamphetamine and various narcotics lawfully available only by prescription. I have drafted and executed search warrants which have led to the recovery of physical and electronic evidence. I have conducted hundreds of hours of physical surveillance and conducted numerous interviews with individuals suspected of committing a wide variety of crimes, ranging from homicide to human trafficking. I have investigated the distribution of various types of scheduled drugs and familiarized myself with current criminal trends and behaviors in regard criminal enterprise matters. I am familiar with and have participated in all of the normal methods of investigation, including but not limited to surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of undercover agents, the use of Grand Jury, and the use of court authorized wire and electronic intercepts.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to search the device described in Attachment A for evidence of these crimes, as described in Attachment B.

## ITEMS TO BE SEARCHED

5.      I seek a warrant to search the item more fully described in Attachment A, hereinafter "the Device." The Device is a black Samsung Galaxy smartphone in a black rubber case and with an IMEI number of 355180461830870. It was seized from room #809 at the DoubleTree Hotel in South Portland Maine on November 21, 2024. Daniel Lydon has stated the Device belongs to him. It is further described in Attachment A.

6.      The applied-for warrant would authorize forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.      The DEA, together with partner agencies, has been investigating a subject known as "Manny" for his involvement in the distribution of illegal controlled substances in Maine. The DEA has obtained multiple prior warrants related to this investigation and its investigation has shown that Manny, working with co-conspirators, brings large quantities of controlled substances from out-of-state into the District of Maine for further distribution.

8. On November 21, 2024, agents with the Maine Drug Enforcement Administration (MDEA) developed information that Daniel Lydon was present in Room 809 of the DoubleTree Hotel in South Portland Maine. Lydon had an active arrest warrant for allegedly violating the terms of his State of Maine probation conditions. Based on the information that he was present inside Room 809, MDEA applied for and obtained a State of Maine search warrant to search Room 809 for the person of Lydon. Agents executed that warrant and arrested him inside Room 809.

9. While arresting Lydon inside Room 809, officers observed in plain view evidence of drug use and possession. Special Agent Dean Hannon of the MDEA then wrote an application for an amendment to his prior search warrant, to obtain judicial authority to search Room 809 for drug-related evidence. Later in the evening on November 21, 2024, investigators searched Room 809 for drug-related evidence and items, pursuant to that warrant.

10. Inside the room, MDEA seized distributor quantities—based on my training and experience—of various controlled substances, to include over 800 grams of substance suspected based on field testing to contain fentanyl and over 100 grams of a substance suspected based on field testing to contain methamphetamine. The Device was also located in Room 809, on a kitchen counter.

11. Meanwhile, Lydon had been detained in a nearby room for an interview. Lydon received Miranda warnings and repeatedly asked that he be allowed to ingest fentanyl in exchange for information. He acknowledged, however, understanding his Miranda rights and explained that he had two drug suppliers, one of whom he identified as "Manny." He gave several details about "Manny" that were known to

investigators and positively identified a photograph of the individual believed to be Manny. He further stated that the Device was his phone and he identified a number for Manny that was, at the time, known to investigators to be used by Manny and the subject of an active cellular location warrant issued by this Court. Lydon explained that he would purchase between two and five "sticks" from Manny at any one time. Lydon later explained that he had purchased upwards of ten "sticks" on occasion. Based on my training and experience, I know a "stick" of fentanyl to refer to a 10-gram cylindrical package of fentanyl powder. Lydon further stated that sometimes Manny instructed him to use CashApp to pay for drugs and that such CashApp transactions would be on his phone. He also stated that he would arrange drug transactions with Manny over the phone.

12. Following this interview, MDEA took custody of the Device. The DEA subsequently seized the Device from MDEA.

13. Based on my training and experience, the quantities Lydon described obtaining from Manny are inconsistent with quantities possessed solely for personal use. When questioned, Lydon avoided answering about selling the drugs that he acquired from Manny. Lydon stated on more than one occasion that answering certain questions would not be good for him. Lydon stated that Manny came to Maine every two or three days to deliver drugs. Lydon stated that he had met with Manny as recently as two days prior. Lydon further described that while arranging drug transactions with Manny over the phone, Manny would often have one of his other "runners" communicate with Lydon via cell phone about a particular time and place to meet for the transaction.

*Status of Device to be Searched*

14. The Device is currently in the lawful possession of DEA. It came into the agency's possession as a result of the seizure describe above. I seek this warrant to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws. The Device is currently in storage at an evidence locker at DEA Portland Resident Office in Portland, Maine. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

**TECHNICAL TERMS**

15. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

6

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic

data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for

entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

16. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. It is also capable of accessing the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

18.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

19. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

20. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

21. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Nicholas Gowen, Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Dec 04 2024

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title